UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

| | | |
|---|---|---|
| EMA FINANCIAL, LLC, a Delaware Limited Liability Company, | : | Case No.: 20-cv-324 |
| | : | |
| Plaintiff, | : | |
| - against - | : | **COMPLAINT** |
| | : | |
| FLITWAYS TECHNOLOGY, INC., a Nevada Corporation, ISLAND CAPITAL MANAGEMENT LLC, d/b/a ISLAND STOCK TRANSFER, a Florida Limited Liability Company, and MIRO ZECEVIC, a Citizen of Florida, | : | |
| Defendants. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

Plaintiff, EMA Financial, LLC ("EMA" or "plaintiff"), by its undersigned attorneys, for its complaint, respectfully alleges as follows:

**PRELIMINARY STATEMENT**

1.      This is an action for specific performance, a permanent injunction, breach of contract, breach of a third party beneficiary agreement, tortious interference, securities fraud, and related relief arising as the result of defendants' conduct in connection with certain agreements to purchase securities, and related convertible note agreements.  After entering into negotiated, arms-length agreements, for which defendants received valuable consideration, Flitways Technology Inc. ("Flitways") breached the agreements, in numerous ways, including, *inter alia*, by: (i) failing to honor EMA's notices of conversion, (ii) failing to increase the share reserve mandated by the agreements. Capital Management LLC d/b/a Island Stock Transfer ("Island") is named herein because Island breached certain agreement, of which EMA was explicitly made a third party beneficiary of, which required Island to honor conversion notices, which Island failed to do. Finally, Miro Zecevic ("Zecevic") is named herein because Zecevic committed tortious interference and securities fraud, and used his position as a controlling shareholder and executive

of Flitways in order to disseminate a fabricated 8k filing with the United States Securities Exchange Commission. Accordingly, plaintiff seeks the relief set forth herein.

## PARTIES

2.      Plaintiff EMA Financial, LLC ("EMA" or "plaintiff") is a limited liability company duly organized under the laws of the State of Delaware and having a place of business located at 40 Wall Street, New York, New York.

3.      The members of EMA reside in New York and Delaware.

4.      For purposes of diversity, EMA is a citizen of New York and Delaware.

5.      Upon information and belief, Defendant Flitways Technology Inc. ("Flitways") is a corporation organized and existing under the laws of the State of Nevada having its principal place of business located at 224 Datura Street, Suite 1015, West Palm Beach, Florida 33401. For purposes of diversity, Flitways is a citizen of Nevada and Florida.

6.      Upon information and belief, Defendant Island Capital Management LLC d/b/a Island Stock Transfer ("Island") is a Florida Limited Liability Company having its principal place of business at 15500 Roosevelt Blvd, Suite 301 Clearwater, Florida 33760.

7.      Upon information and belief, the members of Island each reside in Florida.

8.      For purposes of diversity, Island is a citizen of Florida.

9.      Upon information and belief, Miro Zecevic ("Zecevic") has a principal residence and place of business at 224 Datura Street, #1015, West Palm Beach, Florida 33401.

10.     For purposes of diversity, Zecevic is a citizen of Florida.

11.     No member of EMA is a citizen of Nevada or Florida.

12.     There is therefore complete diversity of citizenship.

2

## JURISDICTION AND VENUE

13.     The Court has jurisdiction pursuant to 28 U.S.C. §1332(a)(2) in that the action is between citizens of different states and the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs.

14.     This Court has supplemental jurisdiction of Plaintiff's various state law claims pursuant to 28 U.S.C. Section 1367(a).

15.     This Court also has jurisdiction pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 ("Rule 10b-5"), as well as various related state law claims.

16.     This Court also has jurisdiction over this action pursuant to Section 27 of the Exchange Act.

17.     Venue is proper in this District pursuant to 27 U.S.C. §1391(a), in that it is a judicial district in which a substantial part of the events or omissions giving rise to the claims occurred, or a substantial part of the property which is subject to this action is situated.

18.     Additionally, in the relevant agreements, defendants consented to jurisdiction and venue in the Southern District of New York.

## FACT COMMON TO ALL CLAIMS FOR RELIEF

19.     On or about March 2, 2017, after arm's-length negotiations, Flitways executed a Securities Purchase Agreement (the "First SPA") and issued a Convertible Note to EMA (the "First Note") in the principal amount of $110,000.00.   A true and correct copy of the First Note is attached hereto as Exhibit A.   A true and correct copy of the First SPA is annexed as Exhibit B. On this same date, Flitways issued irrevocable instructions to Island, its transfer agent (the "First

TA Agreement", together with the First Note, First SPA, and other related transaction documents, the "First Agreements") whereby it reserved certain shares to allow conversions of its stock, as described in further detail below. A true and correct copy of the First TA Agreement is annexed hereto as Exhibit C.

20. EMA fully funded its purchase of the First Note, and wired the funds to Flitways' bank account, as per the written directions provided by Flitways' CEO.

21. On or about July 14, 2017, after arm's-length negotiations, Flitways executed an additional Securities Purchase Agreement (the "Second SPA") and issued another Convertible Note to EMA (the "Second Note") in the principal amount of $110,000.00. A true and correct copy of the Second Note is attached hereto as Exhibit D. A true and correct copy of the Second SPA is annexed as Exhibit E. On this same date, Flitways issued irrevocable instructions to Island, its transfer agent (the "Second TA Agreement", together with the Note, SPA, and other related transaction documents, the "Second Agreements") whereby it reserved certain shares to allow conversions of its stock, as described in further detail below. A true and correct copy of the Second TA Agreement is annexed hereto as Exhibit F.

22. EMA fully funded its purchase of the Second Note, and wired the funds to Flitways' bank account, as per the written directions provided by Flitways' CEO.

23. Evidencing that the First Agreements and Second Agreements were funded and were valid agreements, Flitways' auditors, confirmed the debts with the Flitways' independent auditor Rose, Snyder & Jacobs, LLP

24. Flitways repeatedly acknowledged the validity of the First Agreements and the Second Agreements in its public SEC filings.

25.     For example, in the Flitways Form 10-K, dated on or about April 18, 2017, Flitways

stated the following:

> In March 2017, the Company entered issued two convertible promissory notes both
> in the amount of $110,000 for an aggregate principal amount of $220,000 (the
> "Notes"). The Notes accrue interest at 10% per annum with the principal and
> accrued interest due and payable in October 2017. The principal amount and all
> accrued interest are convertible into shares of the Company's common stock at a
> rate $0.10 per share, subject to adjustments for events of default. Each holder was
> issued a warrant to purchase 187,500, for a total of 375,000, of the Company's
> common stock with a strike price of $0.12 per share, subject to adjustments. Events
> of default include non-compliance with the Exchange Act. Should the Company be
> found in default, the conversion rate would be adjusted to 24%, and the conversion
> rate would be adjusted to the lower of $0.10 or 65% of the average of the 2 lowest
> sale prices and trading prices as defined in the agreements during the 25 consecutive
> trading days immediately preceding the conversion date or the closing bid price,
> whichever is lower, or $0.00001 if the company loses the bid. There is also an
> adjustment if the stock becomes chilled, or in the case of dilutive issuances.

26.     Indeed, Flitways went so far as to include a copy of the First Note as part of the

same Form 10-K, once again, acknowledging the validity of the First Agreements.

27.     In the Flitways Form 8-K, dated on or about August 2, 2017, in Item 1.01, Flitways

stated as follows:

> On July 14, 2017, Flitways Technology, Inc. (the "Company") entered into a
> Securities Purchase Agreement ("SPA") with EMA Financial, LLC ("EMA"). Upon
> the terms and subject to the conditions of the SPA, the Company issued a
> convertible promissory note in the principal amount of $110,000.00 (the "Note") to
> EMA. The Company received proceeds of $99,250.00 in cash from EMA. Interest
> accrues on the outstanding principal amount of the Note at the rate of 10% per year.
> The Note is due and payable on July 14, 2018 subject to the right of the holder to
> extend the maturity date for up to one year. The Note is convertible into common
> stock, subject to Rule 144, at any time after the issue date at $.10 per share subject
> to adjustment as provided in the Note. If the shares are not delivered to EMA within
> three business days of the Company's receipt of the conversion notice, the
> Company will pay EMA a penalty of $1,000 per day for each day that the Company
> fails to deliver such common stock through willful acts designed to hinder the
> delivery of common stock to EMA. Subject to the terms of 1.1 of the Note EMA
> does not have the right to convert the note, to the extent that it would beneficially
> own in excess of 4.9% of the Company's outstanding common stock. During the
> 180 day period from the issuance of the Note, EMA has the right to require the
> Company to redeem the outstanding balance on the Note for (i) 135% of all unpaid

principal and interest if the redemption date is within 90 days of the issue date and (ii) 155% of all unpaid principal and interest if the redemption date is on or after the 91st day following the issue date. Except as set forth in the Note, the failure to redeem will not be deemed to be an Event of Default under the Note but will result in an adjustment to the conversion price. In the event of default, the amount of principal and interest not paid when due bear default interest at the rate of 24% per annum and the EMA Note becomes immediately due and payable.

The Note is a long-term debt obligation that is material to the Company. The Note also contains certain representations, warranties, covenants and events of default including if the Company is delinquent in its periodic report filings with the SEC, and increases in the amount of the principal and interest rates under the Note in the event of such defaults. In the event of default, at the option of EMA and in EMA's sole discretion, EMA may consider the Note immediately due and payable.
In connection with the purchase of the Note, the Company issued a five-year warrant to purchase 187,500 shares of the Company's Common Stock.

The foregoing descriptions of the SPA, Note and Warrant are qualified in their entirety by reference to such SPA, Warrant and Note, which are filed hereto as Exhibits 10.1, 4.1 and 4.2 and are incorporated herein by reference.

28.     Additionally, in the Form 8-K, dated on or about August 2, 2017, Flitways included

a copy of the Second Note as Exhibit 4.1, thereby, once again, acknowledging the validity of the

Second Agreements.

29.     In the Flitways 10-Q, dated on or about August 21, 2017, Flitways again

acknowledged the validity of the First Note and Second Note,  and stated as follows on P. F-7:

In March 2017, the Company issued two convertible promissory notes both in the amount of $110,000 for an aggregate principal amount of $220,000 (the "March Notes"). The total proceeds were approximately $197,000, due to approximately $23,000 for debt issuance costs. Also, the Company paid a one-time fee of $10,000 to a consultant related to services provided associated with the March Notes. The March Notes accrue interest at 10% per annum with the principal and accrued interest due and payable in October 2017. The principal amount and all accrued interest are convertible into shares of the Company's common stock at a rate $0.10 per share, subject to adjustments for events of default. Each holder was issued a warrant to purchase 187,500 shares, for a total of 375,000 shares, of the Company's common stock with an exercise price of $0.12 per share, subject to adjustments. There is an adjustment to the exercise price if an and when the Company sells or grants an option to purchase any common stock or securities entitling the right to acquire shares of the Company's common stock at an effective price per share less than the exercise price. Events of default include noncompliance with the Exchange

Act. Should the Company be found in default, the interest rate would be adjusted to 24%, and the conversion rate would be adjusted to the lower of $0.10 or 65% of the average of the 2 lowest sale prices and trading prices as defined in the agreements during the 25 consecutive trading days immediately preceding the conversion date or the closing bid price, whichever is lower, or $0.00001 if the Company loses the bid. There is also an adjustment if the stock becomes chilled or in the case of dilutive issuances.

30.     In this same 10-Q, Flitways stated on P. F-8 that:

In May 2017, the Company issued a convertible promissory note in the amount of $110,000 (the "May Note"). The total proceeds were approximately $99,000, due to approximately $11,000 for debt issuance costs. Also, the Company paid a one-time fee of $10,000 to a consultant related to services provided associated with the May Note. The May Note accrues interest at 10% per annum with the principal and accrued interest due and payable in December 2017. The principal amount and all accrued interest are convertible into shares of the Company's common stock at a rate $0.10 per share, subject to adjustments for events of default. The holder was issued a warrant to purchase 187,500 shares of the Company's common stock with an exercise price of $0.12 per share, subject to adjustments. There is an adjustment to the exercise price if an and when the Company sells or grants an option to purchase any common stock or securities entitling the right to acquire shares of the Company's common stock at an effective price per share less than the exercise price. Events of default include non-compliance with the Exchange Act. Should the Company be found in default, the interest rate would be adjusted to 24%, and the conversion rate would be adjusted to the lower of $0.10 or 65% of the average of the 2 lowest sale prices and trading prices as defined in the agreements during the 25 consecutive trading days immediately preceding the conversion date or the closing bid price, whichever is lower, or $0.00001 if the Company loses the bid. There is also an adjustment if the stock becomes chilled or in the case of dilutive issuances.

31.     The First Note and the Second Note each provide that EMA, at any time after September 8, 2017, has the right to convert all or part of the Note into shares of Flitways common stock (the "Common Stock").  Specifically, §1.1 of the Note provides in pertinent part:

The Holder shall have the right, in its sole and absolute discretion, as of September 8, 2017 to convert all or any part of the outstanding amount due under this Note into fully paid and non-assessable shares of Common Stock.

Ex. A at 1.1.

32.     Likewise, 1.4(a) of the First Note and the Second Note each provide that: "Subject to Section 1.1, this Note may be converted by the Holder in whole or in part as of September 8, 2017, by submitting to the Borrower a Notice of Conversion…"

33.     As §1.2(a) of the First Note dictates:

(i) The conversion price hereunder (the "Conversion Price") shall equal $0.10 per share, provided, however, that if an Event of Default (as defined herein) occurs at any time after the Issue Date, then the conversion price  hereunder ("Default Conversion Price") shall while this Note remains outstanding equal the lower of: (i) the Conversion Price, and (ii) 65% of the average of the two (2) lowest sale prices for the Common Stock on the Principal Market during the twenty-five (25) consecutive Trading Days immediately preceding the Conversion Date or the closing bid price, whichever is lower, provided, however, if the Company's share price at any time loses the bid (ex: 0.0001 on the ask with zero market makers on the bid on level 2), then the Conversion Price may, in the Holder's sole and absolute discretion, be reduced to a fixed conversion price of 0.00001 (if lower than the conversion price otherwise)…

34.     As §1.2(a) of the Second Note dictates:

(i) The conversion price hereunder (the "Conversion Price") shall equal $0.10 per share, provided however, if Borrower fails to comply with Section 1.9 herein then the conversion price hereunder ("Default Conversion Price") shall while this Note remains outstanding equal 60% of either the average of the two (2) lowest sale prices for the Common Stock on the Principal Market during the twenty five (25) consecutive Trading Days immediately preceding the Conversion Date or the closing bid price, whichever is lower, provided, however, if the Company's share price at any time loses the bid (ex: 0.0001 on the ask with zero market makers on the bid on level 2), then the Conversion Price may, in the Holder's sole and absolute discretion, be reduced to a fixed conversion price of 0.00001 (if lower than the conversion price otherwise)…

35.     Further, under §1.4(d) of First Note and the Second Note:

Upon receipt by the Borrower from the Holder of a facsimile transmission or e-mail (or other reasonable means of communication) of a Notice of Conversion meeting the requirements for conversion as provided in this Section 1.4 or upon an event triggering the calculation of an Adjusted Conversion Price, the Borrower shall issue and deliver or cause to be issued and delivered to or upon the order of the Holder certificates for the Common Stock issuable upon such conversion within three (3) business days after such  receipt or such  an event (the "Deadline")…

36.     In order to ensure that sufficient shares are available for conversion, §1.3 of the

First Note and the Second Note each provide that:

> The Borrower covenants that the Borrower will at all times while this Note is outstanding reserve from its authorized and unissued Common Stock a sufficient number of shares, free from preemptive rights, to provide for the issuance of Common Stock upon the full conversion of this Note. The Borrower is required at all times to have authorized and reserved seven (7) times the number of shares that is actually issuable upon full conversion of this Note (based on the Conversion Price of the Notes in effect from time to time)(the "Reserved Amount"). Initially, the Company will instruct the Transfer Agent to reserve five million seven hundred thousand (5,700,000) shares of common stock in the name of the Holder for issuance upon conversion hereof. The Borrower represents that upon issuance, such shares will be duly and validly issued, fully paid and non-assessable.

37.     In order to ensure that EMA at all times has shares reserved in connection with the

outstanding Note, §5 of First SPA and the Second SPA each state that:

> Upon receipt of a duly executed Notice of Conversion, the Company shall issue irrevocable instructions to its transfer agent to issue certificates, registered in the name of the Purchaser or its nominee, for the Conversion Shares in such amounts as specified from time to time by the Purchaser to the Company upon conversion of the Note, or any part thereof, in accordance with the terms thereof (the "Irrevocable Transfer Agent Instructions"). In the event that the Company proposes to replace its transfer agent, the Company shall provide, prior to the effective date of such replacement, a fully executed Irrevocable Transfer Agent Instructions in a form as initially delivered pursuant to this Agreement and the Securities (including but not limited to the provision to irrevocably reserve shares of Common Stock in the Reserved Amount (as defined in the Note)) signed by the successor transfer agent to Company and the Company…The Company warrants that: (i) no instruction other than the Irrevocable Transfer Agent Instructions referred to in this Section 5, and stop transfer instructions to give effect to Section 2(f) hereof (in the case of the Conversion Shares, prior to registration of the Conversion Shares under the 1933 Act or the date on which the Conversion Shares may be sold pursuant to Rule 144 without any restriction as to the number of Securities as of a particular date that can then be immediately sold), will be given by the Company to its transfer agent and that the Securities shall otherwise be freely transferable on the books and records of the Company as and to the extent provided in this Agreement and the Note; (ii) it will not direct its transfer agent not to transfer or delay, impair, and/or hinder its transfer agent in transferring (or issuing)(electronically or in certificated form) any certificate for Conversion Shares to be issued to the Purchaser upon conversion of or otherwise pursuant to the Note as and when required by the Note and this Agreement;  and it will not fail to remove (or direct its transfer agent not to remove or impair, delay, and/or hinder its transfer agent from removing) any

restrictive legend (or to withdraw any stop transfer instructions in respect thereof) on any certificate for any Conversion Shares issued to the Purchaser upon conversion of or otherwise pursuant to the Note as and when required by the Note and this Agreement. Nothing in this Section shall affect in any way the Purchaser's obligations and agreement set forth in Section 2(g) hereof to comply with all applicable prospectus delivery requirements, if any, upon re-sale of the Securities. If the Purchaser provides the Company with (i) an opinion of counsel in form, substance and scope customary for opinions in comparable transactions, to the effect that a public sale or transfer of such Securities may be made without registration under the 1933 Act and such sale or transfer is effected or (ii) the Purchaser provides reasonable assurances that the Securities can be sold pursuant to Rule 144, the Company shall permit the transfer, and, in the case of the Conversion Shares, promptly instruct its transfer agent to issue one or more certificates, free from restrictive legend, in such name and in such denominations as specified by the Purchaser.

38.     Likewise, Section 2.7 of the First Note and the Second Note each state:

The Borrower shall not change its transfer agent without the prior written consent of the Holder.  Any resignation by the transfer agent without a replacement transfer agent consented to by the Holder prior to such replacement taking effect shall constitute an Event of Default hereunder.


39.     The First TA Agreement states as follows:

You are hereby irrevocably authorized and instructed to reserve a sufficient number of shares of common stock ("Common Stock") of the Company (initially, 5,700,000 shares[1] of Common Stock which should be held in reserve for the Investor pursuant to the subject Note as of this date) for issuance upon full conversion of the Note referenced herein in accordance with the terms thereon.   The amount of Common Stock so reserved in connection with the Note may be increased, from time to time by written instructions of the Investor. Without any further action or confirmation by the Company. The Investor shall also have the right, without any further action or confirmation by the Company, to periodically request the number or Company's outstanding shares. The amount of Common Stock so reserve  in connect ion with the Warrants may be increased from time to time, by written instructions of the Investor, without  any  further action  or confirmation by the Company.

The ability to convert the Note in a timely manner is a material obligation of the Company pursuant to the Note. Your firm is hereby irrevocably authorized and instructed to issue shares of Common Stock of the Company (without any restrictive legend) to the Investor at the request of Investor without any further

---

[1] The Second TA Letter contains substantially similar language but deals with a different number of shares and a warrant.

action or confirmation by the Company, in which the issuance shall be deducted against the reserve or if there are not enough shares held in reserve, from available authorized shares of the Company by either (i)electronically by crediting the account of a Prime Broker with the Depository Trust Company through its Deposit Withdrawal Agent Commission system provided that the Company has been made FAST/DRS eligible by DTCC (DWAC), or (ii) in certificated form without any legend which "could restrict the transfer of the shares and you should remove all stop transfer instructions relating to such shares: (A) upon your receipt from the Investor dated within 90 days from the date or the issuance or transfer request, of: (i) a notice of conversion ("Conversion Notice") executed by the Investor ; and (ii) an opinion of counsel of the Investor, in form substance and scope customary for opinions of counsel in comparable transactions (and satisfactory to the transfer agent), to the effect that the shares or Common Stock of the Company issued to the Investor pursuant to the Conversion Notice are not "restricted securities" as defined in Rule 144 and should be issued to the Investor without any restrictive legend: and (B) the number of shares to the issued is less than 4.99% of the total issued common stock of the Company, or 9.99'% of the total issued common stock of the Company if specified by Investor…If an opinion from counsel is not provided, you are instructed and authorized to issue shares to the Investor as restricted and the associated certificate(s) should include the customary 144 restrictive legend.

The Company affirms that it has appropriately resolved to issue all required Common Stock to the investor and hereby requests that your firm act immediately without delay and without the need for any action or confirmation by the Company with respect to the issuance of Common Stock pursuant to any Conversion Notices received from the Investor.

40.     Finally, Page 3 of the First TA Agreement and the Second TA Agreement each explicitly provide that: "The Investor is intended to be and are third party beneficiaries hereof, and no amendment or modification to the instructions set forth herein may be made without the consent of the Investor."

## FLITWAYS BREACHES THE AGREEMENTS

41.     On or about February 1, 2018, EMA requested that Flitways increase the share reserve, as required by the First Agreements and the Second Agreements.

42.     However, in violation of the agreements, on or about February 15, 2018, Island informed EMA that it did not have sufficient shares to raise the reserve.

11

43.     Indeed, despite the fact that Flitways authorized an increase in the amount of authorized shares several times, it never made a sufficient amount of shares available to EMA in order to meet the request to raise the reserve by the number of shares requested, as required by the agreements.

44.     On or about October 29, 2019, EMA submitted a Notice of Conversion to Island (the "October 29, 2019 Notice of Conversion"), seeking to convert $2,250.00 in principal of the Second Note into 75,000,000 shares of Flitways, in accordance with Section 1.2(a) of the Second Note.

45.     As mandated by the Second Note, EMA submitted a legal opinion of its counsel providing for the conversion of a portion of the Second Note into unrestricted shares, together with all ancillary documents required by the Second Agreements.

46.     Despite the obligation of both Island and Flitways under the various agreements to process the October 29, 2019 Notice of Conversion and issue unrestricted shares within three days, they failed to do so.

47.     Instead, Flitways told Island not to process the October 29, 2019 Notice of Conversion—in spite of the language in the Second Agreements mandating that the shares be issued without the need for consent from Flitways.

48.     Island informed EMA that Mr. Zecevic had reached out to Island and directed Island to reject the conversion.  Island also provided EMA with a board resolution whereby Mr. Zecevic was appointed Chairman of the Board and President of Flitways.

49.     Upon information and belief, Mr. Zecevic became the controlling shareholder of Flitways after the First Agreements and Second Agreements were entered into, and used his

position as a controlling shareholder to assume control of Flitways and prevent Flitways from honoring its obligations to EMA.

50.    Additionally, on October 29, 2019, Mr. Zecevic emailed EMA and stated the following:

> Our bank records also show that FTWS received NO MONEY from EMA and that you may have funded the private co-owned by Tobi Mac ARo the ex-management
>
> See 8k filed in 2018
> https://www.otcmarkets.com/filing/html?id=13008751&guid=zvOSUnFS3bO5m3h
>
> Can we see all your proof of payments, please?
>
> You may have funded the private co and never paid for these shares. We have been asking for this info from at least February 2019
>
> We have placed the TA on notice and are currently retaining a securities barrister for his opinion
>
> I await your reply

51.    In other words, despite the irrefutable proof of funding and the repeated acknowledgements in the Flitways public filings, Mr. Zecevic claimed that the various notes were not funded in a poorly disguised effort to prevent EMA from exercising its contractual rights.

52.    Flitways further interfered with the October 29, 2019 Notice of Conversion by paying an attorney by the name of Timothy P. Thomas to send Island a letter dated October 31, 2019 claiming that—despite irrefutable evidence to the contrary and despite Flitways' repeated acknowledgment of the First Agreements and the Second Agreements and its receipt of the funds in its SEC filings—that it was the position of Flitways that "had no record" of the receipt of funds that were paid.

53.    Although the letter provided by Mr. Thomas did not constitute an opinion letter (it did not state either a legal conclusion or engage in legal analysis), and the letter relied only on the

statements of Zecevic and was contrary to the various agreements, Island refused to process the October 29, 2019 Notice of Conversion, despite its explicit obligation to do so.

54.     In fact, by letter dated November 4, 2019, EMA's counsel pointed out that Island was obligated to process the conversion, and noted that Mr. Thomas's letter did not constitute an opinion, was contradicted by the transaction documents, the documentary evidence, and Flitways' own SEC filings, and appears to have been based solely on inaccurate information provided by Mr. Zecevic.  Despite this fact, both Island and Flitways refused to proceed with the October 29, 2019 Notice of Conversion.

55.     On November 14, 2019—more than ten days after Flitways and Island were obligated to provide the unrestricted shares in accordance with the October 29, 2019 Notice of Conversion—Flitways provided an additional letter from yet another attorney named James Kohl, that claimed that  defendants should not provide unrestricted stock as "EMA failed to demonstrate that it provided payment for the convertible Note and therefore has not held the stock under the applicable holding period", a statement that is demonstrably false and contradicted by Flitways' public filings.

56.     On or about November 25, 2019, EMA submitted a Notice of Conversion to Island (the "November 25, 2019 Notice of Conversion"), seeking to convert $1,125.00 in principal of the First Note into 75,000,000 shares of Flitways, in accordance with Section 1.2(a) of the First Note.

57.     As mandated by the First Note, EMA submitted a legal opinion of its counsel providing for the conversion of a portion of the First Note into unrestricted shares, together with all ancillary documents required by the First Agreements.

58.     Despite the obligation of both Island and Flitways under the various agreements to process the November 25, 2019 Notice of Conversion and issue unrestricted shares within three days, they failed to do so.

59.     Instead, Island sent an email to EMA asserting that "We were just notified by Flitways again that they feel the issuance is in violation of securities laws and will be providing the legal opinion".

60.     In fact, no valid legal opinion was provided, which, in any event, would be a violation of the terms of the First Agreements and the Second Agreements.

61.     Accordingly, EMA is entitled to enforce each of its rights under the various agreements.

62.     Section 3.2 of the First Note and the Second Note provides for a breach in the event that:

> The Borrower fails to issue shares of Common Stock to the Holder (or announces or threatens in writing that it will not honor its obligation to do so at any time following the execution hereof or) upon exercise by the Holder of the conversion rights of the Holder in accordance with the terms of this Note, fails to transfer or cause its transfer agent to transfer (issue) (electronically or in certificated form) any certificate for shares of Common Stock issued to the Holder upon conversion of or otherwise pursuant to this Note as and when required by this Note, the Borrower directs its transfer agent not to transfer or delays, impairs, and/or hinders its transfer agent in transferring (or issuing) (electronically or in certificated form) any certificate for shares of Common Stock to be issued to the Holder upon conversion of or otherwise pursuant to this Note as and when required by this Note, or fails to remove (or directs its transfer agent not to remove or impairs, delays, and/or hinders its transfer agent from removing) any restrictive legend (or to withdraw any stop transfer instructions in respect thereof) on any certificate for any shares of Common Stock issued to the Holder upon conversion of or otherwise pursuant to this Note as and when required by this Note (or makes any written announcement, statement or threat that it does not intend to honor the obligations described in this paragraph)… It is an obligation of the Borrower to remain current in its obligations to its transfer agent. It shall be an event of default of this Note, if a conversion of this Note is delayed, hindered or frustrated due to a balance owed by the Borrower to its transfer agent…

63.    Likewise, Section 5 of the First SPA and Second SPA provides that

Upon receipt of a duly executed Notice of Conversion, the Company shall issue irrevocable instructions to its transfer agent to issue certificates, registered in the name of the Purchaser or its nominee, for the Conversion Shares in such amounts as specified from time to time by the Purchaser to the Company upon conversion of the Note, or any part thereof, in accordance with the terms thereof (the "Irrevocable Transfer Agent Instructions"). In the event that the Company proposes to replace its transfer agent, the Company shall provide, prior to the effective date of such replacement, a fully executed irrevocable Transfer Agent Instructions in a form as initially delivered pursuant to this Agreement and the Securities (including but not limited to the provision to irrevocably reserve shares of Common Stock in the Reserved Amount (as defined in the Note)) signed by the successor transfer agent to Company and the Company.

64.    Similarly, 3.15 of the First Note and the Second Note provides that:

"In the event that the Borrower proposes to replace its transfer agent, the Borrower fails to provide, prior to the effective date of such replacement, a fully executed Irrevocable Transfer Agent Instructions in a form as initially delivered pursuant to the Purchase Agreement (including but not limited to the provision to irrevocably reserve shares of Common Stock in the Reserved Amount) signed by the successor transfer agent to Borrower and the Borrower."

65.    Based on the foregoing events, Flitways' failure to honor EMA's Notices of Conversion, and instructions to its transfer agent not to deliver shares pursuant to a conversion notice, and other actions and omissions has given rise to one or more "Events of Default" pursuant to the terms of the First Note and the Second Note. In addition thereto, Flitways' conduct has caused multiple "Events of Default" to occur.

66.    Section 3.16 of the First Note and the Second Note outlines the negotiated-for and agreed-upon remedies for the differing Events of Default. Among other things, EMA is permitted to enforce any and all of plaintiff's rights under the First Note and Second Note and the First SPA and the Second SPA, or otherwise as permitted by law.

67.     Page 1 of the First Note and the Second Note provides that: "Any amount of principal or interest on this Note which is not paid when due shall bear interest at the rate of twenty-four (24%) per annum from the due date thereof until the same is paid ("Default Interest")."

68.     Due to Flitways' persistent and willful failure to remedy its various breaches, as of filing the instant action, default interest has been accruing at a rate of 24%.

69.     Section 3.16 of the First Note and the Second Note provides that, in the Event of Default, "all other amounts payable hereunder shall immediately become due and payable, all without demand, presentment or notice, all of which hereby are expressly waived, together with all costs, including, without limitation, legal fees and expenses, of collection, and the Holder shall be entitled to exercise all other rights and remedies available at law or in equity."

70.     EMA has been, and continues to be, irreparably harmed by Flitways' failure to honor the Notices of Conversion, and failure to establish and maintain a reserve.

71.     Damages from Flitways' failure to deliver the shares are inherently uncertain and difficult to calculate.   Since the   Note's issuance on December 19, 2017, Flitways' Stock price has ranged from a high of $.0278 on December 19, 2017 and a low of $.00006 on October 17, 2019

72.     Thus, the timing of conversions and sale of stock is essential to the determination of damages.  Because it is difficult to discern with any accuracy precisely when EMA would have sold the converted shares, and how many it would sell had the conversions been honored, calculating its precise losses is difficult.

73.     Additionally, Flitways has asserted in its public filings and its communications that it is functionally insolvent.

74.     All notices and prerequisites to bringing this action, if any, including notices of default, have been complied with or were waived.

**The Materially False and Misleading 8K Filed By Mr. Zecevic**

75.     On or about October 15, 2018 Mr. Zecevic caused to be filed with the SEC an 8K that he knew contained materially false and misleading statements (the "October 15, 2018 8K").

76.     The October 15, 2018 8K contained numerous false and material statements that were intended to affect the price of Flitways' stock.

77.     Among other things, the October 15, 2018 8K asserted that "On September 12, 2018 the new interim management commenced a search for a bankruptcy chapter 11 barrister in Nevada. The new management mandate is to seek out and to settle all outstanding debts with the existing creditors on all cash and or cash and stock basis on a civil basis without seeking the Protections of the bankruptcy laws."  In fact, this statement was a poorly disguised attempt to make EMA settle its debts for pennies on the dollar.

78.     The October 15, 2018 8K claimed that "During Mr. Mac Aro inappropriate conduct and behavior the interim management reached out to existing FLIT creditors such as AUCTUS Fund EMA and Power Up which entered into convertible debt type arrangements with FLIT. This group represents approximately 65% of the debt. The creditors overwhelmingly agreed via multiple emails to settle all debts on a fraction to a dollar. "Virtual Settlement". Approximately 150 million shares were allocated to words this debt settlement".

79.     This statement is materially false.  At no point did EMA, and upon information and belief, the other creditors, ever agree to settle the debts for "on a fraction to a dollar".  In fact, EMA (and upon information and belief, Auctus and Power Up), had never entered into any kind of settlement with Flitways.  Instead, this statement was designed to make shareholders believe

that Flitways was honoring its obligations to EMA and others, when in fact, it was refusing to do so.

80.    The October 15, 2018 8K claimed that "Both AUCTUS Fund and EMA as of the date of this filing continue to honor the Virtual Settlement".  In fact, EMA (and upon information and belief, Auctus), had never entered into any kind of settlement with Flitways.  Instead, this statement was designed to make shareholders believe that Flitways was honoring its obligations to EMA and others, when in fact, it was refusing to do so.

81.    Further, a large portion of the October 15, 2018 10k is dedicated to the supposed fraud and mismanagement of the previous management and contains numerous statements claiming that the previous management committed fraud against the company.  The October 15, 2018 8K claimed that "During the month of September 2018, it was identified that the motive behind Mr. Mac Aro sabotage of FLIT was due to the fact that Mr. Mac Aro assumed the new management would increase the authorized shares to 2 Billion shares and whereby Mr. Mac Aro would receive 500 Million shares as a "golden parachute" for termination of his employment. Once Mr. Mac Aro was made aware that the preferred shareholder and new interim management offered creditors cash as full settlement on a fraction of the debt owed by FLIT and that the FLIT creditors were receptive to this settlement and whereby the existing share structure of FLIT would either slightly increase or remain undisturbed Mr. Mac Aro intensified the sabotage in an effort to completely undermine any recovery of FLIT".  Once again, this statement is materially false as no agreement was ever reached with EMA, nor was EMA ever, and upon information and belief, the other creditors, ever "receptive" to a settlement that would pay it a fraction of the debt.

82.    The October 15, 2018 8K constitutes the dissemination of false and misleading statements in connection with the purchase and sale of securities through the participation in a

fraudulent scheme and course of conduct.  Furthermore, the information contained in the October 15, 2018 8K is material.  The statements propagated therein permitted Flitways to lay blame for its poor financial condition on previous management and further falsely claimed that it had or would imminently enter into a settlement with EMA and others for a fraction of the debt effectively conveyed to investors and potential investors the deceptive notion that Flitways was not responsible for the volatility of its stock or its fiscal state, and artificially influenced Flitways perceived market value and investor perceptions of the company in the short-term.

83.     Further evidencing that the October 15, 2018 8K was materially false is a subsequent email sent by Mr. Zecevic on or about December 4, 2019 where he stated as follows:

> Just so that we are clear and that there's no misunderstandings as per various 8K filings and previous fraud committed by the ex-management FTW S is a virtually judgment proof. The company is in a rebuilding stage and the recently filed 8Ks are self-explanatory. Be that as it may, we are again extending you an offer which has been accepted by other creditors of the company who are in the same boat as you…
>
> Other creditors are settling penny's on the dollar in cash.   If this is what you want we can definitely accommodate you as we will spend this money in the litigation defense and counterclaim/clawback in any event.  If you can kindly provide us with detailed amounts owed on all notes that may help us wrap our mind around the issue.   You will need to do this in any event if your intention is to commence litigation. Neither I nor Daniel know the exact amount owed or allegedly owed to your firm. We have requested this information on numerous occasions to no avail. We have just learned of this new note and a new date. How many more notes are there to various entities with the same Flitways name?

84.     The email sent by Mr. Zecevic made clear that, contrary to the 8K that Mr. Zecevic caused to be filed, no deal had ever been reached with EMA.  Instead, Mr. Zecevic explicitly referenced the 8k that he caused to be filed as part of his explicit threat that unless EMA settled for "pennies on the dollar", they would be wiped out.   It is thus clear that the 8K was filed by Mr.

Zecevic as part of a poorly disguised attempt to threaten EMA and other investors and manipulate the price of the Company stock.

## FIRST CLAIM FOR RELIEF
## (SPECIFIC PERFORMANCE – AGAINST FLITWAYS)

85.     EMA realleges and incorporates by reference each and every allegation contained in all preceding paragraphs of this Complaint as if fully set forth herein.

86.     Pursuant to the First Note and Second Note, the First SPA and Second SPA, and related agreements, Flitways is obligated to deliver shares of Flitways' Common Stock pursuant to the deadline set forth in the First Note and the Second Note, to enable EMA to sell the shares publicly without restriction.

87.     Despite its obligation to do so, Flitways has refused and failed to deliver said shares of stock to EMA.

88.     Flitways has further failed to increase the share reserve, as required by the various agreements between the parties.

89.     As a result of such failures and refusals by Flitways, EMA has suffered damages.

90.     EMA has no adequate remedy at law.

91.     In the absence of injunctive relief and specific performance, EMA will suffer irreparable harm.

92.     EMA requests, therefore, that the Court enter an Order requiring Flitways to specifically perform the relevant agreements, including the First Note and First SPA, Second Note and Second SPA, and the First Transfer Agent Agreement and Second Transfer Agent Agreement, and to deliver immediately to EMA the shares of its Common Stock pursuant to each Notice of Conversion submitted, to increase the share reserve, as well as to provide EMA with the necessary

resolutions that may be required, and to take whatever steps necessary (as per the terms of the agreements), sufficient to enable EMA to sell the shares publicly without restriction.

**SECOND CLAIM FOR RELIEF**
**<u>(BREACH OF CONTRACT-AGAINST FLITWAYS)</u>**

93.     EMA realleges and incorporates by reference each and every allegation contained in all preceding paragraphs of this Complaint as if fully set forth herein.

94.     The First Agreements and Second Agreements are valid and binding agreements.

95.     As set forth more fully above, Flitways breached the First Agreements and Second Agreements.   Flitways' numerous breaches include, but are not limited to:

(i)      failing to honor the Notices of Conversion submitted; and

(ii)     failing to increase the share reserve; and

(iii)    its failure to honor of the terms, conditions, representations, covenants and warranties of the First SPA and Second SPA and First Note and Second Note;

96.     Flitways' conduct constitutes a breach of, and default under, the terms of the First Agreements and Second Agreements.

97.     EMA has performed all obligations of the relevant agreements that were its obligation to perform except for those obligations that it could not perform because of defendant's breaches herein.

98.      EMA is therefore entitled to an award of damages in an amount to be determined at trial but in any event in excess of principal in the sum of $220,000.00, including without limitation the balance of any portion of the First Note and Second Note that ultimately is not converted into shares, along with default interest, liquidated damages, and damages as provided for in the First Note and the Second Note and by law.

**THIRD CLAIM FOR RELIEF**
**(PERMANENT INJUNCTION-AGAINST FLITWAYS)**

99.     EMA realleges and incorporates by reference each and every allegation contained in each preceding paragraph of this Complaint as if fully set forth herein.

100.     §4.10 of the First Note and the Second Note provides:

Borrower acknowledges that the remedy at law for a breach of its obligations under this Note will be inadequate and agrees, in the event of a breach or threatened breach by the Borrower of the provisions of this Note, that the Holder shall be entitled, in addition to all other available remedies at law or in equity, and in addition to the penalties assessable herein, to an injunction or injunctions restraining, preventing or curing any breach of this Note and to enforce specifically the terms and provisions thereof, without the necessity of showing economic loss and without any bond or other security being required.

101.     Likewise, Section 5 of the First SPA and Second SPA provides:

The Company acknowledges that a breach by it of its obligations hereunder will cause irreparable harm to the Purchaser, by vitiating the intent and purpose of the transactions contemplated hereby. Accordingly, the Company acknowledges that the remedy at law for a breach of its obligations under this Section 5 may be inadequate and agrees, in the event of a breach or threatened breach by the Company of the provisions of this Section, that the Purchaser shall be entitled, in addition to all other available remedies, to an injunction restraining any breach and requiring immediate transfer, without the necessity of showing economic loss and without any bond or other security being required.

102.     Pursuant to its obligations under the relevant agreements, Flitways is obligated to deliver shares of its Common Stock, along with the necessary resolutions and acceptance of the legal opinions furnished by EMA, sufficient to enable EMA to sell the shares publicly without the restrictive legend.

103.     Despite its obligation to do so, Flitways has failed and refused to deliver said shares of stock to EMA as required by each Notice of Conversion and requests for shares under the agreements.

104.     As a result of such refusal by Flitways, EMA has suffered damages.

105.     EMA has no adequate remedy at law.

106.     In the absence of injunctive relief, EMA will suffer irreparable harm.

107.     Additionally, Flitways consented to an injunction when entering into the First Agreements and Second Agreements.

108.     EMA requests, therefore, that the Court enter an Order enjoining and requiring Flitways to deliver the shares of stock as called for in the relevant agreements in response to the Notice of Conversion, and requests for shares that were sent, to provide executed instructions from the transfer agent in the required form, and to honor future conversion notices.

## FOURTH CLAIM FOR RELIEF
## (BREACH OF THIRD PARTY BENEFICIARY AGREEMENT-AGAINST FLITWAYS AND ISLAND)

109.     EMA realleges and incorporates by reference each and every allegation contained in each preceding paragraph of this Complaint as if fully set forth herein.

110.     In connection with the SPA, Flitways and Island executed the First TA Agreement and the Second TA Agreement.

111.     Both the First TA Agreement and the Second TA Agreement are each a valid agreement.

112.     Page 3 of the First TA Agreement and the Second TA Agreement each explicitly provide that: "The Investor is intended to be and are third party beneficiaries herein, and no amendment or modification to the instructions set forth herein may be made without the consent of the Investor."

113.     EMA is therefore a third party beneficiary of the First TA Agreement and the Second TA Agreement.

114.     Flitways and Island have breached the agreement by failing to honor the Notices of Conversion, failed to increase the reserve, and have indicated that they would not honor future conversion notices.

115.     EMA therefore, is entitled to an award of damages in an amount to be determined at trial, but in excess of $220,000.00.

**FIFTH CLAIM FOR RELIEF**
**(SPECIFIC PERFORMANCE OF THIRD PARTY BENEFICIARY AGREEMENT-**
**AGAINST FLITWAYS AND ISLAND)**

116.     EMA realleges and incorporates by reference each and every allegation contained in each preceding paragraph of this Complaint as if fully set forth herein.

117.     In connection with the SPA, Flitways and Island executed the First TA Agreement and the Second TA Agreement.

118.     Both the First TA Agreement and the Second TA Agreement are each a valid agreement.

119.     Page 3 of the First TA Agreement and the Second TA Agreement each explicitly provide that: "The Investor is intended to be and are third party beneficiaries herein, and no amendment or modification to the instructions set forth herein may be made without the consent of the Investor."

120.     EMA is therefore a third party beneficiary of the First TA Agreement and the Second TA Agreement.

121.     Flitways and Island have breached the agreement by failing to honor the Notices of Conversion, failed to increase the reserve, and have indicated that they would not honor future conversion notices.

122.     The First TA Letter and Second TA Letter provides:

You are hereby irrevocably authorized and instructed to reserve a sufficient number of shares of common stock ("Common Stock") of the Company …for issuance upon full conversion of the Note referenced herein in accordance with the terms thereon.   The amount of Common Stock so reserved in connection with the Note may be increased, from time to time by written instructions of the Investor. Without any further action or confirmation by the Company. The Investor shall also have the right, without any further action or confirmation by the Company, to periodically request the number or Company's outstanding shares. The amount of Common Stock so reserve in connection with the Warrants may be increased from time to time, by written instructions of the Investor, without any further action or confirmation by the Company.

The ability to convert the Note in a timely manner is a material obligation of the Company pursuant to the Note. Your firm is hereby irrevocably authorized and instructed to issue shares of Common Stock of the Company (without any restrictive legend) to the Investor at the request of Investor without any further action or confirmation by the Company, in which the issuance shall be deducted against the reserve or if there are not enough shares held in reserve, from available authorized shares of the Company by either (i)electronically by crediting the account of a Prime Broker with the Depository Trust Company through its   Deposit Withdrawal Agent Commission system provided  that the Company has been made FAST/DRS eligible by DTCC (DWAC), or (ii) in certificated form without  any legend which "could restrict the transfer of the shares and you should remove all stop transfer instructions relating to such shares:  (A) upon  your receipt from  the  Investor dated within 90 days from the date  or the  issuance  or transfer request, of:  (i)  a notice of conversion   ("Conversion Notice") executed by the Investor ; and (ii) an opinion of counsel of the Investor, in form  substance and  scope customary  for  opinions  of counsel  in  comparable transactions (and satisfactory to the  transfer agent), to the effect that the shares or Common Stock of the Company issued to the Investor pursuant to the Conversion Notice are not "restricted securities" as defined in Rule 144 and should be issued to the Investor without any restrictive legend: and (B) the number of shares to the issued is less than  4.99%  of  the  total  issued  common stock of the Company, or 9.99'% of the total issued common stock of the Company if specified by Investor…If  an opinion  from counsel  is not provided,  you  are  instructed  and authorized to issue shares to the Investor as restricted and the associated certificate(s) should include the customary 144 restrictive legend.

The  Company affirms  that it  has  appropriately resolved  to issue all required Common Stock to the investor and hereby requests that your firm act immediately without delay and without the need for any action or

confirmation by the Company with respect to the issuance of Common Stock pursuant to any Conversion Notices received from the Investor.

123.   Pursuant to the First Agreements and Second Agreements, which includes the First TA Letter and Second TA Letter, Island and Flitways are obligated to deliver shares of Flitways' Common Stock pursuant to the deadline set forth in the First Note and the Second Note, to enable EMA to sell the shares publicly without restriction.

124.   Despite its obligation to do so, Island and Flitways have refused and failed to deliver said shares of stock to EMA.

125.   Flitways and Island have further failed to increase the share reserve, as required by the various agreements between the parties.

126.   As a result of such failures and refusals by Flitways and Island, EMA has suffered damages.

127.   EMA has no adequate remedy at law.

128.   In the absence of injunctive relief and specific performance, EMA will suffer irreparable harm.

129.   EMA requests, therefore, that the Court enter an Order requiring Flitways and Island to specifically perform the relevant agreements, including the First Note and First SPA, Second Note and Second SPA, and the First Transfer Agent Agreement and Second Transfer Agent Agreement, and to deliver immediately to EMA the shares of its Common Stock pursuant to each Notice of Conversion submitted, to increase the share reserve, as well as to provide EMA with the necessary resolutions that may be required, and to take whatever steps necessary (as per the terms of the agreement), sufficient to enable EMA to sell the shares publicly without restriction.

## SIXTH CLAIM FOR RELIEF
## (TORTIOUS INTERFERANCE–AGAINST ZECEVIC)

130.     EMA realleges and incorporates by reference each and every allegation contained in all preceding paragraphs of this Complaint as if fully set forth herein.

131.     The First Agreements and Second Agreements are valid and binding agreements.

132.     As set forth more fully above, Flitways breached the First Agreements and Second Agreements.   Flitways' numerous breaches include, but are not limited to:

(iv)     failing to honor the Notices of Conversion submitted; and

(v)     failing to increase the share reserve; and

(vi)     its failure to honor of the terms, conditions, representations, covenants and warranties of the First SPA and Second SPA and First Note and Second Note;

133.     Flitways' conduct constitutes a breach of, and default under, the terms of the First Agreements and Second Agreements.

134.     EMA has performed all obligations of the relevant agreements that were its obligation to perform except for those obligations that it could not perform because of defendant's breaches herein.

135.     As set forth above, Zecevic knowingly and intentionally, improperly, maliciously, and without justification, interfered with the First Agreements and Second Agreements by, among other things, instructing Island not to honor the Notices of Conversion that were sent by EMA and instructing Island not to increase the share reserve.

136.     EMA has suffered substantial damages as a result of Mr. Zecevic's conduct.

137.     EMA therefore, is entitled to an award of damages in an amount to be determined at trial, but in excess of $220,000.00.

**SEVENTH CLAIM FOR RELIEF**
**(VIOLATIONS OF SECTION 10(B) OF THE SECURITIES EXCHANGE ACT**
**OF 1934 AND RULE 10B-5 PROMULGATED THEREUNDER-AGAINST ZECEVIC**
**AND FLITWAYS)**

138.    EMA realleges and incorporates by reference each and every allegation contained in all preceding paragraphs of this Complaint as if fully set forth herein.

139.    The false allegations and omissions in the SEC filings that were filed by Flitways and caused to be filed by Zecevic, and its proposals and communications with noteholders and shareholders were material in that a reasonable shareholder would consider them important in deciding how to vote.

140.    The false allegations and omissions in the SEC filings, and proposals and communications with noteholders and shareholders are also material, in that, by offering false information about a nonexistent settlement with EMA and others, the statements served to exert influence upon Flitways' securities by providing holders and potential purchasers of Flitways' stock artificial confidence in the company's fiscal condition and stability.

141.    Zecevic, as the Chairman of the Board and President of Flitways, and its controlling shareholder, caused the filing of, and approved the SEC filings, and proposals and communications with noteholders and shareholders.

142.    Zecevic directly benefited from the SEC filings, and proposals and communications with noteholders and shareholders as he is the controlling shareholder and it artificially increased the stock price of his shares.

143.    In releasing the SEC filings, Zecevic, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails, and/or the facilities of a national exchange, made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading, in violation of Section 10(b) of the Exchange Act and Rule

10b-5 promulgated thereunder.  The false and misleading statements and omissions contained in the SEC filings were intended to and did, as alleged herein: (i) deceive the investing public; (ii) artificially influence the value of Flitways' securities; and, (iii) cause EMA and other investors damage as a result of the statements contained therein.

144.   Zecevic was individually and collectively responsible for making the statements and omissions alleged herein, by virtue of having prepared, approved, and/or disseminated documents which contained untrue statements of material facts and/or omitted facts necessary to make the statements therein not misleading.

145.   As described, Zecevic made the false statements and omissions knowingly and intentionally, or in such an extremely reckless manner as to constitute willful deceit and fraud upon EMA and other members of the investing public who relied upon such statements.

146.   The knowledge of Zecevic, as the Chairman of the Board and President of Flitways, and its controlling shareholder, is imputed to Flitways.

147.   Moreover, as a party to the sham alleged herein, with knowledge (through Zecevic) that the purpose and effect of the actions described herein was to manipulate and materially misstate Flitways' financial condition to benefit the value of Zecevics' shares in Flitways, Zecevic and Flitways are liable under Section 10(B) and Rule 10b-5.

148.   Zecevic and Flitways' false statements and omissions were made in connection with the purchase and/or sale of Flitways' securities.

149.   Zecevic's conduct constitutes a violation of fiduciary duty owed to Flitways.

150.   Zecevic's conduct has harmed Flitways by substantially increasing Flitways' credit risk in the eyes of lending institutions and has degraded the integrity of Flitways' enterprises and securities.

151.    EMA has standing to sue derivatively as a shareholder of Flitways.

152.    EMA has suffered substantial damage as a result of defendants' conduct.

153.    EMA therefore, is entitled to an award of damages in an amount to be determined at trial, but in excess of $220,000.00.

### EIGTH CLAIM FOR RELIEF
### (CONTROLLING PERSON LIABILITY PURSUANT TO SECTION 20(A) OF THE SECURITIES EXCHANGE ACT OF 1934 AGAINST ZECEVIC)

154.    EMA realleges and incorporates by reference each and every allegation contained in each preceding paragraph of this Complaint as if fully set forth herein.

155.    This claim is brought pursuant to Section 20(a) of the Exchange Act against Zecevic.

156.    Zecevic was a controlling person of Flitways at the time the SEC filings were disseminated as a result of his position as President, Chairman of the Board, and controlling shareholder.

157.    By virtue of the foregoing, Zecevic had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Flitways, including the content and dissemination of the SEC filings.

158.    Zecevic did not act in good faith in connection with the conduct at issue in this claim.  Further, Zecevic directly or indirectly induced the act or acts constituting violations of Section 10(b) and Rule 10b-5 by Flitways, among other things, orchestrating sham releases of materially misleading information that caused Flitways' condition to be materially misstated, and the dissemination of false information to investors and prospective investors.

159.    Zecevic is liable for participation in the matters alleged herein because they acted with knowledge that Flitways' public statements were materially false or misleading, or omitted material information, or acted with reckless disregard for the truth.

160.    By virtue of his position as a controlling person of Flitways, Zecevic is jointly and severally liable for those violations pursuant to Section 20(a) of the Exchange Act, with and to the same extent as Flitways.

**NINTH CLAIM FOR RELIEF**
**(<u>COSTS, EXPENSES & ATTORNEYS FEES</u>)**

161.    EMA realleges and incorporates by reference each and every allegation contained in each preceding paragraph of this Complaint as if fully set forth herein.

162.    In accordance with the First Agreements and Second Agreements between the parties, Flitways agreed to pay all costs and expenses, including reasonable attorneys' fees and expenses, incurred by EMA in collecting any amount under the First Agreements and the Second Agreements.

163.    Section 4.5 of the First Note and the Second Note states, "If default is made in the payment of this Note, the Borrower shall pay the Holder hereof costs of collection, including reasonable attorneys' fees."

164.    Therefore, EMA is entitled to an award for costs and expenses incurred in the prosecution of this lawsuit, including reasonable legal fees.

**<u>CLAIM FOR RELIEF</u>**

**WHEREFORE**, Plaintiff EMA seeks judgment against Defendants as follows:

I.        On the First Claim for Relief, EMA requests that the Court enter an Order requiring Flitways to specifically perform the relevant agreements, including the First Note and First SPA, Second Note and Second SPA, and the First Transfer Agent Agreement and Second Transfer Agent

Agreement, and to deliver immediately to EMA the shares of its Common Stock pursuant to each Notice of Conversion submitted, to increase the share reserve, as well as to provide EMA with the necessary resolutions that may be required, and to take whatever steps necessary (as per the terms of the agreements), sufficient to enable EMA to sell the shares publicly without restriction; and

   II.   On the Second Claim for Relief, EMA requests an award of damages against Flitways in an amount to be determined at trial but in any event in excess of principal in the sum of $220,000.00, including without limitation the balance of any portion of the First Note and Second Note that ultimately is not converted into shares, along with default interest, liquidated damages, and damages as provided for in the First Note and the Second Note and by law; and

   III.   On the Third Claim for Relief, the issuance of an injunction enjoining and requiring Flitways to deliver the shares of stock as called for in the relevant agreements in response to the Notice of Conversion, and requests for shares that were sent, to provide executed instructions from the transfer agent in the required form, and to honor future conversion notices; and

   IV.   On the Fourth Claim for Relief, EMA requests an award of damages against Flitways and Island in an amount to be determined at trial but in any event in excess of principal in the sum of $220,000.00; and

   V.   On the Fifth Claim for Relief, EMA requests that the Court enter an Order requiring Flitways and Island to specifically perform the relevant agreements, including the First Note and First SPA, Second Note and Second SPA, and the First Transfer Agent Agreement and Second Transfer Agent Agreement, and to deliver immediately to EMA the shares of its Common Stock pursuant to each Notice of Conversion submitted, to increase the share reserve, as well as to provide EMA with the necessary resolutions that may be required, and to take whatever steps

necessary (as per the terms of the agreement), sufficient to enable EMA to sell the shares publicly without restriction; and

VI.        On the Sixth Claim for Relief, EMA requests an award of damages against Zecevic in an amount to be determined at trial but in any event in excess of $220,000.00; and

VII.       On the Seventh  and Eighth, claim for Relief, for an order allowing Mr. Zecevic to be held personally liable for all acts of self-dealing and violation of fiduciary duty to Flitways, for damages against Zecevic and Flitways in an amount to be determined, but in any event in excess of $220,000.00; and for punitive damages in the sum of $1 million; and

VIII.      On the Ninth Claim for Relief for an award of EMA's costs and expenses in prosecuting this action, including reasonable legal fees;

IX.        On all Claims for Relief, for interest, attorneys' fees and the costs and disbursements of this action; and for such other further relief as the Court may deem just, proper, and in the interest of justice.


Dated: January 14, 2020
         New York, New York

                              LAW OFFICE OF JEFFREY FLEISCHMANN PC
                              By: /s/ Jeffrey Fleischmann
                                   Jeffrey Fleischmann, Esq.

                              *Attorneys for Plaintiff EMA Financial, LLC*

                               150 Broadway, Suite 900
                               New York, N.Y. 10038
                               Tel. (646) 657-9623
                               Fax (646) 351-0694
                               jf@lawjf.com